IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

RENAE EKSTRAND,

                    Plaintiff,

        v.

SCHOOL DISTRICT OF SOMERSET,

                 Defendant.

OPINION and ORDER

08-cv-193-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

      This is a civil case in which plaintiff Renae Ekstrand alleges that defendant School District of Somerset violated her rights under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12112(a) by failing to provide her with a reasonable accommodation and constructively discharging her when she became disabled from severe depression.  It is before the court on defendant's motion for summary judgment.

      A close review of the facts in the case shows that although plaintiff has adduced enough evidence to allow a jury to find that she became a "qualified individual with a disability" before she left the school district, her evidentiary showing falls short when it comes to her allegations that defendant failed to engage in the interactive process required to provide her with reasonable accommodations and that it treated her so abusively that it could be considered constructive discharge.  No reasonable jury bould find that defendant

did not meet its obligations under the ADA to engage in an interactive process or that its treatment of plaintiff amounted to a constructive discharge. Therefore, defendant's motion for summary judgment will be granted.

From the parties' proposed findings of fact, I find the following facts to be material and undisputed.

UNDISPUTED FACTS

A. Plaintiff's Employment at the School District before the 2005-2006 School Year

Plaintiff Renae Ekstrand has been employed as an elementary school teacher since 1989. She began working for defendant School District of Somerset in September 2000. She spent the first four years of her employment as a junior kindergarten teacher. For the 2004-2005 school year, plaintiff transferred from that job to a regular kindergarten teaching position and for the 2005-2006 school year, she transferred to a first grade teaching position. Plaintiff requested each of the transfers in part to reduce her stress levels.

B. Plaintiff's Mental Health Leading up to the 2005-2006 School Year

In either 1997 or 1998, plaintiff was diagnosed with fibromyalgia. Since then, her fibromyalgia has caused her widespread muscular pain, extreme fatigue, migraine headaches, irritable bowel syndrome, sensitivity to noise, anxiety and depression. These symptoms vary

2

in intensity, although she says that generally "her condition has been managed well, with minimal disruptions to her life."  Cpt., ¶ 4.

Plaintiff has suffered from depression since the early 1980's, and has taken prescribed anti-depressant medications on and off since that time.  Sometime in the late 1990's, one of her treatment providers told her that the depression and fibromyalgia symptoms she was experiencing sounded like seasonal affective disorder, although plaintiff does not know whether the doctor diagnosed that disorder at that time.  Depression with a seasonal pattern may be signs of a mental disorder known as seasonal affective disorder, in which a person experiences depression and changes in sleep pattern with the change of seasons.

In January 2004, plaintiff saw a psychologist, Dr. Randi Erickson, who diagnosed a generalized anxiety disorder with panic attacks, and "depression, not otherwise specified." Although Dr. Erickson did not diagnose seasonal affective disorder at the time, he assigned a "rule-out" diagnosis for the disorder, a sort of "deferred diagnosis" reflecting that, although some of plaintiff's symptoms were indicative of seasonal affective disorder, they were "currently mild" because she had not been found to have a major depressive disorder, one necessary element of the disorder.  In January 2004, Dr. Arnold Potek prescribed plaintiff antidepressants for the depression and anxiety she was suffering.  She took medication for several months but stopped taking it because the side effects outweighed the advantages.

On March 30, 2004, Dr. Erickson concluded that plaintiff "likely" had seasonal

affective disorder, although the first date that Dr. Erickson can state "to a reasonable degree of probability," that plaintiff met the criteria for "Major Depression, Recurrent, With Seasonal Patterns," was October 17, 2005.  Plaintiff saw Dr. Kari Smith at the Osceola Medical Center on March 20, 2004, and was prescribed a different antidepressant for depression and anxiety.

In early 2005, plaintiff began experiencing symptoms indicating she may have multiple sclerosis and was directed by a neurologist to lessen stress in her life to reduce the reoccurrence and severity of those symptoms.  Plaintiff told her principal, Cheryl Wood, that her doctor had "pre-diagnosed" multiple sclerosis and asked to transfer from a kindergarten to a first grade teaching position for the 2005-2006 school year to work in a less stressful environment.  Wood granted that request.

## C.  The 2005-2006 School Year

### 1.  Plaintiff's room assignment

When plaintiff left school for summer break at the end of the 2004-2005 school year, she did not know the classroom to which she would be assigned for the following school year. In the late spring of 2005, Wood told plaintiff that she might be teaching her first grade class in 2005-2006 in a room off the commons area.

That room had no outside windows, sink, desk or bulletin boards; it had non-diffused

4

florescent lighting; and it was adjacent to the cafeteria and commons area, a place of continual traffic and noise. In addition, the room had not been previously used as a classroom by the district and did not have some of the equipment or fixtures that other established classrooms might have. Plaintiff told Wood that she had depression, including Seasonal Affective Disorder, and would have a difficult time working in that room because she needed natural, rather than fluorescent light.

Sometime during the summer of 2005, plaintiff learned that the district had decided to assign her that room nonetheless. Plaintiff again told Wood that she was concerned about the effect on her health if she had to teach in that room, stating that she would have a very difficult time in this room because it lacked outside windows and had noise distractions and because she had a history of depression and seasonal affective disorder and was experiencing symptoms such as problems with focus and thought retrieval processes.

Although plaintiff asked whether she could be placed in a regular first grade classroom or an empty classroom instead, she was placed in the room off the common area. Wood assigned the first grade classroom to another first grade teacher with less seniority and left the other room unoccupied by any teacher. Another first grade teacher, Ann Jacquet, told Principal Wood in the summer of 2005 that she was willing to switch rooms with plaintiff, but Wood never acted on this offer.

On more than one occasion, plaintiff asked Wood to consider transferring plaintiff's

5

classroom to an empty "deaf-ed" classroom, but Wood denied the reqest.  The second time, Wood stated that the room might be needed for an added third grade class.  Although plaintiff asked Wood to consider simply placing any additional third grade class in the room off the commons, Wood denied the request.  Wood said she was confident that plaintiff "would make the best of it."  At some time before October 17, 2005, Wood told district superintendent Randall Rosburg of plaintiff's request to move to the empty classroom and of Wood's decision to deny that request.

## 2.  Plaintiff's problems with the classroom

In addition to plaintiff's concerns about noise and lack of natural light, plaintiff made a number of complaints about her assigned classroom once the 2005-2006 school year began.  She complained that a) the room's interior lighting was too dark; b) an overhead projector screen was not installed; c) a map was not installed; d) there was no locking cabinet available; e) plaintiff's name plate had not been moved to the new classroom for the school's open house; f) the classroom doors were accessible to all district staff since it had previously been used as a common workroom; and g) there were problems with the room's ventilation.  Plaintiff started receiving calls from parents complaining about their children having headaches and mood changes, which plaintiff believes were related to the problems with the classroom.

To deal with her concerns, plaintiff sent many emails and had many conversations with Wood and the custodian.  In addition, she spent approximately $300 of her own money on full spectrum lights, fans and material for curtains to cover the windows to the cafeteria to eliminate distractions.

Wood had an overhead projector placed in plaintiff's classroom after the school year started.  A locked cabinet was installed and made available to plaintiff during the school year after plaintiff told Wood that $50 collected for student activities had been taken from her desk drawer.  In addition, ventilation changes or repairs were made after the school year started and new locks were placed on the classroom doors in early October.  No maps were ever installed in plaintiff's classroom, to her recollection.  In addition, plaintiff made her own sign and taped it over the existing plate because her nameplate was not moved until after she left work.

Plaintiff complained to Wood that the noise coming from student and teacher traffic to the commons area was a distraction that was frustrating and stressful to her.  Wood arranged to have sound panels or acoustic panels and bristle fringe installed to absorb some of the noise and explained to plaintiff that it would probably take some time for students to learn they needed to be quiet in hallways outside her classroom.

During the first few weeks of September 2005, plaintiff told Wood about parents calling with concerns about their children and requesting that her class be moved to the

7

empty classroom.  She stated that parents would be willing to come in on a weekend and move everything to avoid custodial costs, and asked Wood whether she could move to the empty room.  Wood denied the request, stating that it was a short-term solution to a long-term problem; there was always going to be a lack of space in the building; and even if plaintiff were in there for that school year, she would have to move out for the following school year.

3.  <u>Plaintiff's mental health problems</u>

Plaintiff's anxiety and depression worsened and she began having panic attacks and crying breakdowns during the school day and in the evenings.  During the third or fourth week of the 2005-2006 school year, plaintiff told Wood that she was extremely stressed by the situation, was feeling very helpless, she was a bundle of nerves, was experiencing more frequent headaches and extreme fatigue by the end of the day and that it took a lot for her to come down from being agitated by the noise and the lights.  She told Wood that she needed help.

On one occasion, Wood asked plaintiff how she was doing.  Plaintiff started crying, saying, "'I don't know what is happening to me, but I can't—I can't—I don't know what is happening to me."  In response, Wood reached over and patted plaintiff on the leg and said, "Just look at these beautiful faces. How can you be sad? And how can you be so upset when

8

you look at these faces all day?" In either the fourth or fifth week of school, plaintiff told Wood, "The only way I can keep functioning is I drink every night and I go to bed and I cry. And I sleep all weekend to have enough energy to get back to school the next day."

By late September and early October 2005, plaintiff was suffering from the following symptoms: significant inability to concentrate, organize her thoughts, retrieve words, make decisions or focus on the needs of the students; hypersomnia; racing thoughts, anxiety and panic attacks; uncontrollable crying; inability to eat, and thoughts of suicide.

On or around October 14, 2005, Wood had the lights changed in plaintiff's classroom. Shortly afterwards, a third grade teacher told Wood that she would be willing to switch rooms with plaintiff. Her offer was never acted on by Wood.

Plaintiff believes that her health was adversely affected by an increased level of stress she experienced in the first grade classroom that was caused by the noise distraction, lack of natural light, extreme fluorescent lighting, items not provided at the beginning of the school year and parents complaining to her about the classroom for their children.

4. Initial request for medical leave of absence

On October 17 and 18, 2005 plaintiff saw Drs. Erickson and Potek. They placed her on medication for depression, anxiety and panic attacks and advised her to take a leave of absence for the remainder of the semester. When Dr. Potek had last seen plaintiff in August

9

2005, he was not given reason to think she had ever suffered a major depressive episode or had seasonal affective disorder.  However, when he saw her on October 18, 2005, plaintiff complained of a history of "sleeping difficulty, spontaneous weeping, deterioration of mood over a period of a couple of weeks."  Dr. Potek relied on plaintiff's statements and Dr. Erickson's report from his visit one day earlier to conclude that plaintiff was suffering a major depressive episode, that her serious health condition had started as early as July 2005 and her functional limitations started in early September 2005.

Plaintiff wrote a letter to Rosburg dated October 17, 2005 requesting an immediate three-month medical leave of absence and indicating her intention to file for disability leave in accordance with the collective bargaining agreement.

On October 20, 2005, Rosburg emailed plaintiff, acknowledging his review of her letter and asking her to get a message from her doctor stating "the reason for leave with an exact or estimated duration of time off from work."  That same day the district received a signed certification for medical leave from Dr. Erickson, stating the following about plaintiff's current mental health problems:

- Reported 10/17/05; exacerbated to this state of dysfunction over past month.
- 3 months minimum with appropriate medication & therapy.
- Renae is suffering from major depression, recurrent, severe, with seasonal patterns.
- Current symptoms which affect daily functioning include lack of motivation & energy, inability to concentrate, crying spells - frequent, feelings of despair, insomnia, difficulty with decision making, hyper somnia daytime hours &

10

irritablilty.

In addition, Dr. Potek certified that plaintiff's serious health condition "began approx. July-Aug. 05, worsening in past 3-4 weeks."

In a letter dated October 24, 2005, plaintiff wrote to Superintendent Rosburg in support of her request for a medical leave, stating that "the continual issues with the classroom I was assigned to, including the light situation, the noise distractions, the lack of air circulation, the untimely manner in which needed classroom items were installed, and most importantly, . . . the lack of consideration by Ms. Wood for reasonable accommodations" had been causing her stress, anxiety and clinical depression.

Rosburg replied to plaintiff's request for leave in a letter dated October 24, stating, "you have requested to take a medical leave beginning immediately, with a scheduled return date of January 2006. You may use your available sick days . . . as well as apply for long term disability should the leave extend beyond the 90 day waiting period." Dr. Potek filled out a disability claim form on November 30, 2005, indicating that plaintiff's current functional limitations began on September 9, 2005 and adding that he expected a full recovery, with a return to work date of January 18, 2006.

5. Request for access to sick leave bank

At the beginning of her leave in October 2005, plaintiff had available from her own personal sick leave account a total of 11 days of paid benefits. In addition to personal sick leave defendant had an option of approving a voluntary sick leave bank to which teachers could contribute their unused sick days to another teacher who might need them if defendant could afford it.

Plaintiff asked Rosburg to allow her to use the sick leave bank to cover absences until she returned to work in January 2006. Her union submitted the proper paperwork, requesting a leave bank be opened for at most 60 days of leave time. At that time, Rosburg refused to open the sick leave bank because the original certifications from plaintiff's doctors did not specify exactly how long plaintiff would be off work. However, by late January, after another employee asked to use the sick leave bank, Rosburg asked that the sick leave bank be opened for both plaintiff and the other employee, noting that he "now ha[s] a defined end date for when [plaintiff] will be" on leave. On February 27, 2006, the district approved the voluntary sick leave bank for plaintiff and the other employee. The sick leave days were paid out in April 2006, with plaintiff and the other teacher sharing the contributed sick days.

6. Final request to switch classrooms

Plaintiff met with Rosburg on November 14, 2005 and told him about her distress at having to take a leave of absence and her love of teaching. At the meeting, plaintiff asked

12

Rosburg to be moved to a room that would accommodate her needs upon her anticipated return to work in January 2006.  Rosburg told plaintiff that he does not micromanage his principals and would anticipate no change in her classroom assignment.  (The record does not show that plaintiff made any further attempts to persuade Wood to change her room after talking to Rosburg in November.)

### D.  Continued Leave of Absence

After her medical leave began, plaintiff's symptoms did not improve as anticipated by her therapist.  According to Dr. Erickson, plaintiff's "depression and level of anxiety actually increased" from October 2005 to January 2006 "at least in part as a result of the ongoing stress, frustration and lack of understanding [plaintiff] experienced in her attempts to communicate with the Somerset School District administration" regarding her request for a classroom change and access to the sick leave bank and their general lack of support.  Moreover, Dr. Erickson believes that had plaintiff been assured that she would return to a regular classroom with windows providing natural light, most likely she would have been able to return to defendant in January 2006.  Instead, her doctors recommended extending her leave of absence, first until the beginning of the 2006-2007 school year, then for the duration of the 2006-2007 school year as well.  The district granted her requests for extending the leave of absence.

13

On or about June 14, 2006, defendant received a letter from Dr. Kent G. Brockmann, a board certified psychiatrist.  In the letter Dr. Brockmann stated that:

> It is my professional opinion, as a 10 year Board Certified Psychiatrist with license to practice in the states of Wisconsin and Minnesota, that this patient is not able to return to teaching the First Grade class at the Somerset School. Due to the severity of this patient's disorders she is not able to manage the and specific demands of these children.

Plaintiff did not return to teach for defendant.  While on leave, she obtained a teaching position as an instructor at South Dakota State University for the 2006-2007 school year.  On or about July 9, 2007, defendant received a letter of resignation from plaintiff in which she stated that she had been offered a contract to teach at South Dakota State University for the 2007-2008 school year.  In addition, plaintiff explained that she had no reason to believe the superintendent or principal "will accommodate my medical conditions in the future" and could not "take the emotional risk of working for such individuals whose conduct appears to be acceptable to their superiors and to the school board."

### E. Plaintiff's Return of School Keys and ID

While on extended leave in February 2006, plaintiff was asked to turn in her school keys.  Although plaintiff asked to keep them because she was still an employee and wanted to use the room on weekends, Wood told her to return the keys.  After plaintiff visited her

class on Valentine's Day in 2006, Rosburg emailed plaintiff, "wondering" why she would be visiting the school in light of her doctors' certifications that she should be on an extended leave of absence for her mental health.  He told plaintiff to stay away from the school until her doctors gave him the "all clear" for her return to school and asked her to submit her ID card and keys by February 20, 2006.

After plaintiff disputed whether it would be improper for her to visit school and resisted returning the keys and ID, Wood told plaintiff to provide defendant with letters from her treatment providers indicating that her visits were approved.  Before February 2006, no treatment provider had ever advised plaintiff or her employer that she could not visit the school or communicate with her teaching team.


OPINION

A.  Applicable Standard for ADA Claims

On January 1, 2009, The Americans with Disabilities Amendments Act of 2008 became effective.  The primary purposes of the act include reinstating a "broad scope of protection to be available under the ADA" and rejecting the reasoning and interpretation of the ADA set forth in Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999), and Toyota Motor Manufacturing v. Williams, 534 U.S. 184 (2002).  Pub. L. No. 110-325, § 122 Stat. 3553, 3554 (2008).  Among the amendments are new rules of construction for use in

15

determining the scope of "disability" that favor broad coverage of individuals, 42 U.S.C.A. § 12102(4), and language broadly defining what is required to be "disabled" in the sense of being "regarded as having [a physical or mental] impairment." Id., §§ 12102(1)(C), (3).

According to plaintiff, the broader standards set forth in the Act should be used to determine whether she was "disabled" under the ADA. Plaintiff contends that, because the Act is simply instruction from Congress on how to interpret the ADA, the new law should be applied in this case although the incidents plaintiff complains about occurred well before the new law's effective date. Plaintiff cites no case law in support of her position and Supreme Court precedent suggests otherwise.

As the Court explained in Landgraf v. USI Film Products, 511 U.S. 244, 280 (1994), absent clear congressional intent, a statute enacted after the events in suit does not govern if the statute would have a "retroactive effect" that would "impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." By rejecting the narrow reading of Supreme Court case law on the scope of the the ADA, the amended Act could increase defendant's liability for past conduct. Because plaintiff fails to identify any clear congressional intent authorizing such a retroactive effect, it would be improper to apply the new standards to this case. At any rate, even if the new Act did apply, I see no reason why it would change the outcome of this case. As I explain below, the problem with plaintiff's case is not her proof of disability,

16

but rather her proof that defendant failed to engage in the interactive process to make reasonable accommodations for plaintiff.

### B.  Plaintiff's Disability

Plaintiff contends that defendant discriminated against her in violation of the Americans with Disabilities Act both by failing to accommodate her disability and by constructively discharging her.  For either of these claims, plaintiff must show she is "a qualified individual with a disability" under the Act.  Mobley v. Allstate Insurance Co., 531 F.3d 539, 545 (7th Cir. 2008) (citations omitted) (among other things, plaintiff seeking to establish failure to accommodate claim must show that "she is a qualified individual with a disability"); Rooney v. Koch Air, LLC, 410 F.3d 376, 383 (7th Cir. 2005) (noting that plaintiff's claim for constructive discharge could not succeed in light of his failure to show that he was disabled).

A plaintiff is "disabled" under the ADA if any of the following are true: (1) she has a physical or mental impairment that substantially limits her in one or more major life activities; (2) she has a record of such an impairment; or (3) the employer regarded her as having such an impairment.  42 U.S.C. § 12102(1); Nese v. Julian Nordic Construction Co., 405 F.3d 638, 641 (7th Cir. 2005).  In this case, plaintiff contends that she was disabled because her seasonal affective disorder was an "impairment" that substantially limited her

17

ability to function at work and alternatively because defendant regarded her as having such an impairment.  As the Court of Appeals for the Seventh Circuit has held, a mental health condition such as severe depression is an "impairment" under the ADA once it has been "diagnosed by a health professional."  Krocka v. City of Chicago, 203 F.3d 507, 512 (7th Cir. 2000) (citations omitted).  A plaintiff with such an impairment is disabled under the ADA if the impairment "substantially limits" the plaintiff's ability to perform a "major life activity" such as working.  Id. at 512-13.

Defendant does not deny that plaintiff's mental health condition became serious enough to constitute a disability under the ADA; the parties' dispute relates to *when* she became disabled.  According to plaintiff, she became disabled after she was placed in the classroom in the 2005-2006 school year but before she took a leave of absence on October 17, 2005.  Defendant contends that, to the extent plaintiff became disabled, it was later, after she was no longer "qualified to work."

Defendant's first argument is that plaintiff admitted in her allegations that she was not disabled until at least October 17, 2005.  One glance at the allegations cited puts that argument to rest.  Plaintiff states in her complaint as background that "[a]pproximately 11 years ago, [plaintiff] was diagnosed with fibromyalgia accompanied by depression with seasonal patterns.  Her condition has been managed well, with minimal disruptions to her life."  Defendant contends that this general statement about her mental health somehow

18

establishes specifically that she was never disabled until October 17, 2005. The allegation says no such thing.

Second, defendant argues that plaintiff has no evidence that she was "impaired" under the ADA until October 17, 2005, at the earliest, because this is the first date a doctor diagnosed her major seasonal depression and the first date her doctor can "state to a reasonable degree of probability" that she suffered from this condition. In other words, defendant contends that a medical diagnosis is *necessary* for plaintiff to establish that she was "impaired" under the ADA. Although a medical diagnosis may be evidence of an "impairment" under the ADA, id. at 512, it cannot be the case that such evidence is required in every case because determining whether a person is "disabled" must be done on a "case-by-case basis." Patterson v. Chicago Association for Retarded Citizens, 150 F.3d 719, 726 (7th Cir. 1998) (citation omitted). Because the analysis is individualized, plaintiff cannot be held to a standard requiring her to first receive a doctor's stamp of approval or establish that her condition may be categorized according to the Diagnostic and Statistical Manual of Mental Disorders before she can contend that the condition was severe enough to be a substantially limiting "impairment" under the ADA.

In this case, plaintiff does not suggest that her earlier-diagnosed fibromyalgia or her symptoms related to multiple sclerosis were an "impairment." There is no evidence that plaintiff; major seasonal depression was *diagnosed* before October 17, 2005. However, the

19

evidence does establish that her problematic symptoms started before she was diagnosed. Dr. Erickson stated that plaintiff's condition had "exacerbated to this state of dysfunction over past month [before October 17 2005]" and Dr. Potek stated that her serious health condition had started as early as July and had "worsen[ed] in past 3-4 weeks" before October 17, 2005. In addition, plaintiff adduced evidence that starting in late September she suffered from a significant inability to concentrate, organize her thoughts, retrieve words, make decisions, or focus on the needs of the students; hypersomnia; racing thoughts, anxiety and panic attacks; uncontrollable crying; inability to eat, and thoughts of suicide. Even without a doctor's stamp of approval, her symptoms starting in late September amounted to an "impairment" under the ADA. The next question is whether these symptoms substantially limited her ability to work, as she contends they did.

To determine whether plaintiff was "substantially limited" from working, the court must determine not only that her symptoms significantly restricted her ability to teach at her job, but rather to perform "any teaching job." Patterson, 150 F.3d at 725. In Patterson, the plaintiff was a teacher for mentally disabled children who suffered from paranoia. The court found that, although her paranoia restricted her ability to teach mentally disabled children, it did not block her from performing all teaching jobs; she was still able to teach students who were not mentally disabled. Id. In this case, the symptoms plaintiff was experiencing by late September significantly restricted her ability to teach generally. A

20

teacher who cannot concentrate, organize her thoughts, make decisions, focus on the needs of the students or control her emotions in front of the students cannot be an effective teacher for any student.

Defendant argues next that, even if plaintiff's symptoms were serious enough to be an "impairment" at that point, they were still merely temporary because her doctors initially stated that her leave of absence would be temporary.  Defendant cites Anders v. Waste Management of Wisconsin, 463 F.3d 670, 677 (7th Cir. 2006), and Ogborn v. United Food and Commercial Workers Union, 305 F.3d 763, 767-68 (7th Cir. 2002), for the proposition that an impairment must be permanent or long-term to receive protection from the ADA. Although defendant is correct on the law, plaintiff adduced ample evidence that her problems were not merely temporary.  First, after her visit with Dr. Erickson on October 17, 2005, he certified that her depression was recurrent with a seasonal pattern.  Even if her doctors expected a quick recovery from her current bout with depression, her symptoms could flare up intermittently in light of her diagnosis.  A substantially limiting impairment that occurs only intermittently is still entitled to protection under the ADA if the injury is expected to be recurrent.  Schneiker v. Fortis Insurance Co., 200 F.3d 1055, 1060 (7th Cir. 2000) (intermittent but recurrent impairments covered by ADA).  Second, plaintiff never came back to the district.  Defendant contends that her disability was too "temporary" because soon after she became disabled, her disability became so serious she could not work

21

as a first grade teacher at all.   However, defendant offers no authority supporting its argument that a serious long-term disability should be considered too short-term to warrant protection if it quickly becomes so serious that plaintiff is not "qualified" for the work.   The cases defendant cites both involved single isolated impairments, not impairments that deteriorated.   Anders, 463 F.3d at 677 (one-time panic disorder); Ogden, 305 F.3d at 767-68 (eight-week bout with depression).

Because plaintiff has adduced evidence that her mental health condition was sufficiently serious by late September and that it substantially limited her ability to teach, I conclude that plaintiff was "disabled" under the ADA at that time.   The next question is whether, during the time plaintiff was disabled, she was also a "qualified individual" under the ADA, which defines "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds."   42 U.S.C. § 12111.   As defendant points out, an individual incapable of working is generally not considered a "qualified individual."

In Byrne v. Avon Products, Inc., 328 F.3d 379, 380-81 (7th Cir. 2003), the plaintiff alleged that he was so depressed that he became incapable of staying awake and too suspicious of co-workers to tolerate them.   He contended that his disability made him incapable of working and sought a long-term leave of absence to accommodate his disability. Id.   The court concluded that his request for an extended leave of absence was essentially a

"confess[ion] that he was not a 'qualified individual'" under the ADA.  Id. at 381.

Defendant contends that this case is analogous to Byrne:  once plaintiff requested leave, she never became "capable" of working as a first grade teacher again.  However, defendant misinterprets Byrne.  Although Byrne held that the plaintiff's long term inability to work disqualified him from protection under ADA, this was because it was "his only proposed accommodation."  Id.  In this case, plaintiff did not start out seeking extended leave as her "only proposed accommodation." As late as November 14, 2005, she sought a change in her classroom to accommodate her mental health condition.  Indeed, she has adduced evidence that had she been provided that accommodation, she would have been able to return from her first leave.  As the court explained in Byrne, short-term absence in itself does not disqualify a plaintiff from the protections of the ADA.  Id. (citing Haschmann v. Time Warner Entertainment Co., 151 F.3d 591 (7th Cir. 1998)) (noting that person suffering from recurring intermittent conditions such as arthritis or lupus may be able to do job "even if, for brief periods, the inflammation is so painful that the person must stay home").

After November 14, 2005, however, plaintiff stopped seeking accommodations other than extended leave until she resigned.  In light of Byrne, it appears that November 14, 2005 was the last time plaintiff was "qualified" under the ADA.  Plaintiff does not explain how she continued to be qualified after this date.  In sum, plaintiff has shown that she was a

23

"qualified individual with a disability" only from late September until November 14, 2005.

## C.  Failure to Accommodate

Plaintiff's first claim is that defendant failed to accommodate her disability.  To prevail on this claim, plaintiff must show that "(1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability."  Mobley v. Allstate Insurance Co., 531 F.3d 539, 545 (7th Cir. 2008) (internal quotations omitted).  I have already concluded that plaintiff was a "qualified individual with a disability" from late September until November 14, 2005. In addition, there is no real dispute that defendant was aware of plaintiff's disability by that time.  Plaintiff had told the principal even before school started that she suffered from seasonal affective disorder and needed to keep her stress levels low.  Before late September she had told the principal that she was extremely stressed, was feeling helpless, was a bundle of nerves, and was drinking and crying nightly, putting Wood on notice that, to the extent her condition was intermittent, her symptoms were flaring up.

Thus, the only question left to answer is whether defendant failed to reasonably accommodate plaintiff's disability.  To establish this element, plaintiff must show that she attempted to engage in an interactive process with defendant to determine a reasonable accommodation and defendant was responsible for any breakdown that occurred in that

24

process.  EEOC v. Sears, Roebuck & Co., 417 F.3d 789, 797 (7th Cir. 2005) (citing Baert v. Euclid Beverage, Ltd., 149 F.3d 626, 633 (7th Cir. 1998), and Beck v. University of Wisconsin Board of Regents, 75 F.3d 1130, 1137 (7th Cir. 1996)).  This is where her claim runs into problems.

Plaintiff contends that defendant failed to accommodate her disability when it refused to move her from the classroom that lacked natural light and had other problems with lighting, noise and equipment.  First, I note that it is not a problem that many of the relevant interactions between plaintiff and defendant may have occurred before the first date she has shown that she was "disabled."  Although the parties' back-and-forth on the matter started in the summer before the 2005-2006 school year before her symptoms first became troubling enough to constitute a disability under the ADA, plaintiff continued to seek accommodations even after it became clear that she was disabled.  Thus, if defendant's position on plaintiff's requests had been unreasonable, the appearance of her disability would require it to reconsider that position to avoid violating the ADA.

Instead, plaintiff's problem is that the undisputed facts show that defendant *did* engage in an interactive process to address plaintiff's concerns, even before her symptoms first became problematic.  Although plaintiff was asking for a different room with natural light, that was not her sole concern; she identified problems with interior lighting, noise and equipment.  Over the first two months of the school year defendant addressed most of

25

plaintiff's concerns, replacing the lighting and locks, making ventilation changes and installing sound panels and bristle fringe to reduce noise.    In addition, when plaintiff decided she needed a leave of absence to recover, defendant granted that request and all requests to extend that leave until plaintiff resigned.

Plaintiff contends that this was not enough because, in light of her seasonal affective disorder she needed natural sunlight and defendant was being unreasonable in holding back available options.  However, it is not readily apparent that a room without natural sunlight could not have been made to work for plaintiff and defendant was entitled to first try such an arrangement.  Although the ADA requires that the accommodation provided by an employer effectively accommodates the employee's limitations, the employer is not required to come upon the appropriate solution immediately or even to ultimately provide the exact accommodation that the employee requests.  <u>Mobley</u>, 531 F.3d at 546-47 (citations omitted).  That is why the employer and employee are expected to engage in an interactive process, as "a means for determining what reasonable accommodations are available to allow a disabled individual to perform the essential job functions of the position sought." <u>Sieberns v. Wal-Mart Stores</u>, 125 F.3d 1019, 1023 (7th Cir. 1997).  Regardless whether defendant could have switched plaintiff's classrooms with relative ease, as plaintiff argues, it did not have to start with that option.  Defendant was entitled to try to fix stressors inside the current classroom before concluding that it would have to move plaintiff's classroom.

26

Shortly after defendant made the last of the changes to plaintiff's classroom, plaintiff took her first leave of absence.  After that time, the only attempt she made to continue the "interactive process" with defendant was in November 2005, when she asked superintendent Rosburg to switch her classroom.  He declined, telling her he did not micromanage his principals and that he would anticipate no change in her classroom assignment.  A defendant may not cause a breakdown in the interactive process, Sears, Roebuck & Co., 417 F.3d at 797, but Rosburg's statement cannot be said to be responsible for the breakdown between the parties; it was nothing more than a statement that plaintiff was seeking relief from the wrong person.  Instead of returning to Wood to continue discussions about switching classrooms, plaintiff simply stopped asking to change the classroom.  After that date, the only accommodations plaintiff sought were extensions of her leave of absence, each of which defendant granted.

However, even if Rosburg's refusal to micromanage his principal could be interpreted as a refusal to change the classroom, plaintiff has failed to establish that defendant's final attempts to accommodate her mental health concerns were inadequate because she did not have an opportunity to stabilize and try them out.  By the time the last of the changes were made to the room, plaintiff's problems had exacerbated and she had to take a leave of absence.  Although plaintiff's doctor states that she "likely" could have returned in January had defendant provided her with a room, that is evidence that defendant's *refusal to*

27

*accommodate* was a stressor that prolonged her absence, not that the room as it was continued to be inadequate.

Because defendant engaged in the interactive process and addressed plaintiff's complaints by making changes aimed at reducing her stress, it did not fail to accommodate her disability even though plaintiff broke off attempts to seek further accommodation before she received accommodations that properly addressed her disability.  Therefore, defendant's motion for summary judgment will be granted as to plaintiff's failure to accommodate claim.

## B.  Constructive Discharge

Plaintiff contends that she was constructively discharged because defendant unreasonably refused to provide her a classroom, refused to open the sick leave bank for her until she provided a more certain estimate of her leave time and required her to turn in her keys and ID card when she stated that she would be out for the rest of the school year.  To the extent such treatment could be considered offensive at all, it falls short of supporting a claim for constructive discharge.

A claim for constructive discharge requires that the working environment become "so intolerable that [the plaintiff's] resignation qualified as a fitting response."  Rooney v. Koch Air, LLC, 410 F.3d 376, 382-83 (7th Cir. 2005) (internal quotations omitted).  The treatment must be "so severe or pervasive as to alter the conditions of employment and

28

create an abusive working environment." Mannie v. Potter, 394 F.3d 977, 982 (7th Cir. 2005) (internal quotations omitted). Even assuming, as plaintiff asserts, that defendant's treatment showed that it did not want her to return to work, the incidents she identifies were not severe enough to create the type of abusive environment that has been found to amount to constructive discharge. Taylor v. Western & Southern Life Insurance Co., 966 F.2d 1188, 1191 (7th Cir. 1992) (boss consistently made racial comments and once held a gun to employee's head, took photo, and showed it at staff meeting while making racial jokes); Brooms v. Regal Tube Co., 881 F.2d 412, 417 (7th Cir. 1989) (human resource manager repeatedly showed employee racist pornographic photos and made threatening comments to her including threat to kill her). Therefore, defendant's motion for summary judgment will be granted as to plaintiff's constructive discharge claim as well.

ORDER

IT IS ORDERED that defendant School District of Somerset's motion for summary judgment, dkt. #15, is GRANTED. The clerk is directed to enter judgment in defendant's

29

favor and close this case.

Entered this 3rd day of March, 2009.

BY THE COURT:

/s/

_____

BARBARA B. CRABB
District Judge