UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

---

RENAE EKSTRAND,

    Plaintiff,

vs.                                                         Case No. 08-CV-193-bbc

SCHOOL DISTRICT OF SOMERSET,

    Defendant.

---

**DEFENDANT'S BRIEF IN SUPPORT OF
RENEWED RULE 50 MOTION – LIABILITY**

---

    Defendant School District of Somerset (hereinafter "District"), by its attorneys, Weld, Riley, Prenn & Ricci, S.C., hereby submits this brief in support of its Renewed Rule 50 Motion – Liability that the District Court dismiss plaintiff's claims as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure for the reasons set forth hereinafter.

    No reasonable jury applying the ruling of the Seventh Circuit in this case would have a legally sufficient evidentiary basis to find that the School District of Somerset failed to provide Renae Ekstrand with a reasonable accommodation after it knew that the accommodation was medically necessary.

    The Seventh Circuit held:

> . . . our cases have consistently held that disabled employees must make their employers aware of any nonobvious, medically necessary accommodations with corroborating evidence such as a doctor's note or at least orally relaying a statement from a doctor, before an employer may be required under the ADA's reasonableness standard to provide a specific modest accommodation the employee requests.

Ekstrand v. School District of Somerset, 583 F.3d 972, 976 (7th Cir. 2009).

    The Seventh Circuit applied the standard to this case as follows:

> [Plaintiff] never explained that her doctor had advised of the necessity of natural light. Nor is natural light therapy so widely known as a necessary treatment for seasonal affective disorder that it should have been obvious to the school district before November 28. Ekstrand thus presents no evidence that the school district knew natural light therapy was the only way to accommodate Ekstrand before November 28.

Id. at 976-77. The significance of November 28, 2005 is, of course, that is the date of Dr. Erickson's letter which is the first, and only, doctor's note which in any way related Ekstrand's depression to natural light and exterior windows. That letter was addressed to the District's worker's compensation carrier, and Mr. Rosburg did not see the letter until after the commencement of litigation.

The Seventh Circuit held that Ekstrand had presented "no evidence that the school district knew natural light therapy was the only way to accommodate Ekstrand before November 28." The Court specifically considered and rejected the adequacy of Ekstrand's "conclusory remarks that natural light was necessary to accommodate her, e.g., she never explained that her doctor had advised of the necessity of natural light." Id. at 977.

An analysis of the plaintiff's evidence at trial discloses that plaintiff simply did not, at any time, make the School District aware of the medical necessity of her requested accommodation, a room with exterior windows and natural light.

Ekstrand's descriptions of her conversations with Cherrie Wood and Randy Rosburg never made reference to a doctor or mental health professional. She never went beyond the "conclusory remarks" which the Seventh Circuit found inadequate. The following are direct quotes and paraphrasings of Ekstrand's trial testimony regarding every conversation she had with Cherrie Wood regarding her health or room assignment:

2

1.  Spring 2005 – Ekstrand transcript, pages 20-21:

    I asked Cherrie if she had made a decision where teachers would be placed, and she said no decision had been made, but the two new rooms would be those rooms off of the commons. And so I told her that I was very concerned about being placed in one of those rooms because of my past history and that I knew that if I was in a room that didn't have any windows or natural light, that it would affect my health. And because of the stress, the stress exacerbating the MS symptoms, that that was very worrisome because of course I was going through testing right at that time, and so it was very much on my mind, and I expressed to her what my worries were about being in that room.

    Q: Did you say health concerns or did you specify what your health concerns were?

    A: No. I said because the room doesn't have any natural light, it would be - - I'm scared to be in that room and how it would affect my health and to please consider that when she was deciding who was going to be in that room.

2.  First week of June 2005 – Ekstrand transcript, pages 22-24:

    [Cherrie Wood] still hadn't made a decision. I told her that I had experienced being in a room similar to those rooms in the past. I was in a portable classroom, which is like a little trailer house room, and it had a very small window behind me. All day I was facing my students, so the light was behind me and then a little tiny rectangle window in the door. And I was there for a year and I started really going downhill fast in the fall where I was very teary and just very emotional and I couldn't sleep at night, and I knew - - I recognized the symptoms, and I knew that I was getting more and more depressed. And so there was one day in particular, and I don't know if it was just a stressful day or what happened, but it was the point where I knew I needed help. So I called my doctor, Dr. Potek, and asked, you know, explained what was happening and he suggested that I start medication. And so I started antidepressants at that time. So I shared that with Cherrie, that that happened before, and because of that, I was worried about this happening again.

    And I had been healthy. I had been managing fine. But with the added stress of the multiple sclerosis possible diagnosis and all that was going on, I just was very afraid of what was going to happen if I was in that room, and I shared that with her.

    [Cherrie] responded to me by explaining that one of her good friends had MS and that her friend, when she has a stressful day, she comes home from work and her friend's husband takes care of everything. I said I didn't think that that was the same kind of situation because I was hoping that my MS wouldn't affect me that way and that I was more concerned about the depression part of it, being in that room.

3. Summer 2005 – after Ekstrand's teaching materials were moved into the room adjacent to the commons – Ekstrand transcript, pages 25-26:

> I told [Cherrie Wood] that I was really concerned; on the one hand, I was really frustrated that I hadn't been notified that she had made a decision, and I shared that. I said, you know, that even despite the fact that I told her all about my medical concerns and she didn't respond to that being a reason to not put me in that room, the fact that I was a teacher that had been there for five years, that I assumed I would be moved into a room with a first grade team like a corner office with windows. You know, a new person doesn't get the corner office with windows. It's just kind of an untold rule when you're teaching that if you've been there and you've paid your dues, you get the nicer room, and I thought - - and so I said, you know, Cherrie, I'm just surprised I didn't get that room even if I told - - you know, I did tell you all about my medical concerns, just taking that away, that I got this room. Wood responded that she knew Ekstrand would make the best of it, that Ekstrand was really good at decorating and had a knack for that, and Wood said that it would possibly not be so stressful for Ekstrand to be putting things in that room because she had so much stuff.

4. Spring - Summer 2005 – first grade team meeting – Ekstrand transcript, pages 28-30:

> I was discussing how I was afraid about being in that room and how it was going to affect my health, and most of those people, well, at least three of those people knew that I was undergoing testing for MS, and so we talked about that and what the neurologist had suggested for getting healthy and that kind of thing. And so the idea of being in a room without natural light and exacerbating depression, therefore increasing stress, was discussed. And so I guess - - they're a caring team and they were talking about what can we do. We were brainstorming ideas about what to do.
>
> Ms. Wood was not present when the meeting started but came in after the start of the meeting.
>
> Ann Jacquet [*sic*, "Jauquet"], who had been teaching first grade for many years, suggested we switch rooms. Ms. Wood was present at that time. Ms. Wood did not really respond to Ms. Jauquet's offer.
>
> The team also proposed that Ms. Wood consider using an empty classroom. Wood said that that would not be an option because they were holding that room open in case the numbers for third grade increased and they would have to add a third grade section. The team's suggestion was well, can Renae move into the empty classroom and if you add a third grade, move the third grade into the room Ekstrand would have. Wood said no.

4

Note, Ann Jauquet testified that when she offered to take the classroom that Renae had been assigned to for 2005-06, she did not have any awareness of Ekstrand's physical or emotional health problems. [Ann Jauquet deposition transcript, page 19.]

    5.    Fall 2005 – Ekstrand transcript, pages 37-38:

> After the beginning of school, Ekstrand testified that she was "emotional and stressed because of a lot of the stuff that was going on that were not being taken care of in the classroom; things that were supposed to have been ready by fall for the students . . ." Things were stressful because things weren't ready. Teaching is stressful enough the way it is. Her phone wasn't connected. There were a lot of little things that were having to be dealt with every day about the classroom. And then along with [Ekstrand's] stress of being in this room that was dark and spending long hours there getting ready to have the classroom ready. Ekstrand talked to Ms. Wood about those concerns.

> The first time we really stopped to have a discussion, Ekstrand was working in the teacher work area after school; there were other teachers present in the work area that has a paper cutter and copying machine. Ekstrand relayed again how frustrating it was to be in the classroom, how she was feeling and not being able to see outside during the day, what was happening outside and just the darkness of the room that was really getting to her. Ms. Wood shared a time in her life when she was in an office that had no window and she hung a poster of a Tuscan countryside so that it looked as if it was a window. Ekstrand did not respond.

    6.    Fall 2005 – Ekstrand transcript, pages 38-39:

> The next conversation Ekstrand had with Wood regarding concerns about the room was in mid-September. Ekstrand was working in front of the bulletin board getting the calendar ready for the next day and Wood walked in and asked how things were going and Ekstrand shared with her that they were not going well; that things were happening to her that had never happened to her in the past; that she was so anxious and agitated at the end of the day that she was going to the liquor store after work and buying a six pack of beer and drinking on the way home in an effort to just calm down. Wood said that she was also having a stressful year and was occasionally needing a glass of wine to relax when she got home at the end of the day. That was the end of that discussion.

    7.    Fall 2005 – Ekstrand transcript, pages 39-40:

> The next discussion between Ekstrand and Wood about the room was at the end of September in the cafeteria during snack time. Ekstrand described sitting with her students and that Wood came and sat down next to her and asked how things were going. Ekstrand said they were not going well and started crying and told Wood she didn't understand what was happening to her and that she was having a hard time

>coping and couldn't hold it together during the day. Wood patted her leg and said "Just look at these beautiful faces, that should get you through the day."

8. Fall 2005 – Ekstrand transcript, pages 41-43, 53-54:

>In late September or early October, 2005, parents told Ekstrand they were concerned about their children being in that room. One parent called and asked her if she had recognized any changes in her child because her child was coming home every day with migraines and had to go to bed without supper and that she did some research. Another parent noticed a personality change in her daughter. Parents concerned about their children offered to move Ekstrand's things into the empty classroom so that they wouldn't use custodial staff and be a burden on the District financially. Ekstrand proposed that to Wood, that parents were also concerned about the health of their children, and her health concerns. Ekstrand described that she was just falling apart and tried to plead with Wood to let her move into that empty room. Wood responded that even if she approved the other room for Ekstrand that school year, it would be a short-term solution to a long-term problem because the next school year Ekstrand would have to move out of that room, and so Wood denied the request.

The above testimony of the plaintiff constitutes the totality of Ekstrand's descriptions of conversations with Wood. Ekstrand sent a few e-mails to Wood, only one of which referred to the lights, but not natural lighting. Ekstrand's e-mail of September 14, 2005 suggested changes in the snack times in the cafeteria because of noise. (Plaintiff's Exhibit 4) Ekstrand's e-mail of October 5, 2005 complained of "insanely loud" noise from the lunchroom between 12:30 and 1:00. (Plaintiff's Exhibit 7) Ekstrand's e-mail of October 11, 2005 stated in its entirety:

>Yikes! What happened to the lights in my room? There is a purple/blue haze!?! People are stopping on their way by to look because it's so bizarre! Is this just an experiment? I would prefer the old dark lighting to this!

(Plaintiff's Exhibit 9) Ekstrand and Wood also exchanged e-mails about the disappearance of $50.00 from an activity fund in Ekstrand's desk.

Sections of the discovery depositions of four fellow teachers were read to the jury. Three of them, Jodene VanDam, Ann Jauquet, and Sheryl Johnson gave testimony regarding the first grade teachers' meeting of the spring of 2005 at which Ann Jauquet offered to exchange rooms with

6

Ekstrand.  Jauquet testified that Ekstrand was not enthused about the room because of poor lighting and noise, and she offered to exchange because Ekstrand was upset and Jauquet was sympathetic.  (Jauquet Tr., pp. 10, 12)   Jauquet later testified that when she offered to take Ekstrand's classroom for 2005-06, she was not aware of Ekstrand's health problems, either physical or emotional. (Jauquet Tr., p. 19)  VanDam testified that she knew Wood was at a meeting of the first grade team, believes that Wood was at the meeting where Jauquet offered to switch rooms, but does not know if that was the meeting where the team talked about Renae's Seasonal Affective Disorder. (VanDam Tr., pp. 15-16)   Sheryl Johnson testified that Wood was at the spring meeting when Ekstrand expressed concern about moving into the interior classroom, stating that the room did not have natural light, and that was difficult for her. (S. Johnson Tr., p. 8)  Johnson had prior knowledge that Ekstrand claimed to have Seasonal Affective Disorder but does not know if that term was used at the meeting.  (S. Johnson Tr., p. 9)

Two of the teachers offered to exchange rooms with Ekstrand after she went on leave.  Lesli Johnson went to Wood after the lighting in Ekstrand's room had been changed and stated a willingness to have Ekstrand take her own classroom.  (L. Johnson Tr., pp. 13 - 14)   The lighting in Ekstrand's room was changed during her last week before going on medical leave.  Jodene VanDam suggested Ekstrand be moved to the empty before/after classroom in a discussion with Wood that took place after Ekstrand began her leave.  (VanDam Tr., pp. 26 - 27)

Prior to taking medical leave, Ekstrand's requested accommodation at issue was initially that Ekstrand not be assigned to the interior room and later that she be moved to an exterior room.  There was no communication from Ekstrand or any other source to Wood which substantiated or verified a medical necessity for such accommodation.  The only evidence added since the Seventh Circuit made exactly that finding was Ekstrand's description of her experience some years before in another

7

school district when she was assigned to a portable classroom. This was the only occasion on which Ekstrand claimed to have referenced medication or a physician. Ekstrand attributed a depressive episode, doctor's appointment, and prescription for antidepressants to the classroom, more specifically "a very small window behind [her]" and "a little tiny rectangle window in the door" but gave no indication to Wood that her physician made the same causal connection.

Ekstrand argues that by this exchange, Wood became aware of the medical necessity of assigning her to an exterior classroom. If anything, Ekstrand's description of that event would be more appropriately interpreted as supporting just the opposite conclusion. She had remained in the portable classroom for a full year in spite of seeing Dr. Potek. The doctor did not recommend that she be transferred to a different classroom.

This exchange is but another "conclusory remark" by Ekstrand. Worse, it is misleading. It is a conclusory remark suggesting that, when given the opportunity, her doctor did not advise her of the necessity of natural light. Her doctor did not endorse her conclusions. But, plaintiff argues, from this exchange, a layperson was required to appreciate what her own physician did not: Ekstrand's need for natural light. This does not follow and runs contrary to the Seventh Circuit's decision.

After Ekstrand went on medical leave on October 17, 2005, her requested accommodation changed significantly. From that point forward, Ekstrand requested a room with an exterior window upon her return to school and requested that the District make such assurance. The accommodation requested was the assurance. The medical necessity of this request is even less obvious than the earlier requests for an exterior classroom. There is no evidence that the District received any medical support for the requested accommodation. No evidence supports a finding that the District knew, or should have known, of the medical necessity of such a requested prospective accommodation.

8

      The only communications between Ekstrand, or someone speaking on her behalf, and the District requesting an exterior room upon her return are Ekstrand's letter to Superintendent Randy Rosburg on October 24, 2005, Ekstrand's meeting with Rosburg on November 14, 2005, and Steve Holzhausen's meeting with Rosburg sometime in November of 2005.

      Ekstrand's letter to Rosburg of October 24 is plaintiff's Exhibit 17. Ekstrand's letter of October 24, 2005 states the following:

- I told her [Wood] I believed I would have a very difficult time in one of the rooms without outside windows and with the noise distractions because of my history of Seasonal Affective Disorder and the symptoms I was experiencing in relation to the possible MS such as focus and thought retrieval processes, depression and the need for reducing stress in relation to the reduction of physical attacks or symptoms.

- . . .

- Later, I spoke with Ms. Wood regarding my room assignment and I again shared my concerns about being in the room off the commons and how it would not be an environment conducive for young learners to do their best learning and how I was concerned about it negatively affecting my health to be in a room without natural light. I again asked Ms. Wood if I could please use the empty deaf ed. classroom. Ms. Wood told me she was keeping that room available in case the board approved adding a third grade section. I asked if an added third grade classroom could be assigned to the room off the commons or if a decision was made to not add a section if I could then move to the empty classroom. She told me no and that she was confident I "would make the best of it" in the room off the commons.

The first bullet point describes difficulty with noise, seasonal affective disorder, and MS. The second bullet point mixes complaints about the room not being an environment "conducive for young learners" with her concern about "it negatively affecting my health to be in a room without natural light." These statements may provide enough notice to the District that there was a relationship between Ekstrand's health and natural light, although the statements remain her conclusions which the Seventh Circuit found inadequate. However, and more importantly, by the time of this letter, Ekstrand was on medical leave and her request in that letter was:

9

> My hope is to return to school after the three month medical leave with restored health and a resolution to the classroom issues I have explained so the best teaching and learning can occur for my first graders.

Ekstrand's letter of October 24, 2005 does not include any medical basis on which the Superintendent could have appreciated the medical necessity of prospectively offering Ekstrand an exterior room at some future date.

Ekstrand's description of her meeting with Rosburg on November 14 is found on pages 62 and 63 of her trial transcript. Ekstrand described that she went in to introduce herself because she hadn't heard anything back from the letter. She didn't know if he had received it or not and wanted to let him know about everything that had happened from the school year on. She described that she had just started medication so her emotions were still "very, very raw, and [she] broke down" and had a "really ugly kind of cry where snot is coming out of your nose, and [she] could not stop crying." She told Rosburg how much she wanted to be back teaching and would he consider having her move to the empty classroom. Rosburg stated that he would not talk to Wood about it because he does not micromanage his principals and supported her decision. Clearly, Ekstrand was in no emotional condition to return to school at that time and she later testified that she was asking for assurance of a room with an exterior window "[w]hen I come back from my leave" hoping that it would be sooner than January. (Ekstrand's afternoon trial transcript, pages 34-35.)

Steve Holzhausen met with Rosburg sometime during November. Holzhausen described that during the conversation he had with Rosburg on the sick leave bank issue, they talked about "in general nature, the accommodations that she had requested" and Holzhausen believed that the conversation focused around why it was such a difficult issue when they had a teacher volunteering to switch rooms. That, Holzhausen described, was the limit of the conversation. (Tr. Holzhausen, pages 20-21)

10

The Seventh Circuit held that Ekstrand had presented "no evidence that the School District acted unreasonably in accommodating her disability before November 28." (p. 977) In accordance with the Seventh Circuit's decision, this Court granted defendant's Motion in Limine No. 2 modified to read that:

> Plaintiff is precluded from offering argument that defendant failed to reasonably accommodate her by failing to reassign her to a room with an exterior window before it knew that such accommodation was medically necessary.

There was no evidence offered at this trial from which a jury could reasonably find that the District ever knew that reassigning Ekstrand to a room with an exterior window was a medically necessary accommodation.

The plaintiff never addressed the deficiencies in her case which led to the Seventh Circuit's decision. Ekstrand never explained that her doctor had advised of the necessity of natural light; none of her doctors did so until Dr. Erickson's letter of November 28, 2005, a letter never received by the District until after litigation had begun. Ekstrand never disproved the Seventh Circuit's conclusion that natural light therapy is not so widely known as a necessary treatment for seasonal affective disorder that it should have been obvious to the School District before November 28. Ekstrand never provided corroborating evidence such as a doctor's note or an oral statement from her doctor making the District aware of her "non-obvious, medically necessary accommodation" request. See Seventh Circuit Decision, pp. 976-977.

The Court allowed plaintiff's descriptions of her communications with Wood and the testimony of other teachers to exchange classrooms as background and contextual evidence while recognizing that such evidence did not rise to the level of showing that the District knew of the medical necessity of the requested accommodation. The glaring deficiency of plaintiff's case is that there simply is no such evidence.

WHEREFORE, Defendant School District of Somerset respectfully requests that the District Court grant judgment in its favor, as a matter of law, and against the Plaintiff, Renae Ekstrand, on her Americans With Disabilities claims, dismissing those claims in their entirety, and awarding to Defendant all of its costs and fees as may be permitted by law.

Dated this 19th day of January, 2011.

**WELD, RILEY, PRENN & RICCI, S.C.**

By: /s/
Tom Rusboldt
Wisconsin State Bar No. 1015086
Attorneys for the School District of Somerset

3624 Oakwood Hills Parkway
P. O. Box 1030
Eau Claire, WI   54702-1030
715-839-7786

F:\docs\Insurance\Community\0019Somerset SD-Ekstrand\Brief.Renewed Rule 50 Motion_mtd.wpd